UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 3:22-cr-171 (SVN) |
| | : | |
| v. | : | |
| | : | August 29, 2023 |
| ROBERTO ALICEA a.k.a. "Bebe with the Shrimp" | : | |
| | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The Government respectfully submits this memorandum in aid of sentencing and in response to the defendant's sentencing memorandum that was filed on August 22, 2023.  For the reasons detailed below, the Government asks that the Court adopt the findings of fact in the Presentence Report ("PSR") and impose a sentence of 60 months, near the bottom of the Guidelines range, as sufficient but not greater than necessary to accomplish those various goals of sentencing.

## I.      THE OFFENSE AND RELEVANT CONDUCT

The facts set forth in the Presentence Report regarding the defendant's offense conduct do not appear to be in dispute but are summarized herein with additional detail.

### A. Background

In the early morning of October 21, 2021, officers with the Vernon Police Department arrested Theodore Owens. Owens had multiple outstanding warrants for his arrest and was found in the company of a young woman that he was prevented from contacting due to multiple no-contact orders. At the time of his arrest, Owens was found to be operating a stolen car and was found to be in possession of a stolen firearm and a distribution quantity of cocaine.  In the trunk of Owens' vehicle, officers located the shell of a catalytic converter.[1] Also, inside the vehicle

---

[1] A catalytic converter is a device incorporated into the exhaust system of a motor vehicle that converts toxic gasses and pollutants. The catalyst for this conversion usually is a precious metal such as platinum, rhodium, or palladium, which can be extracted and sold for profit.

officers located two battery powered saws, and extra blades.  During a search of Owens' cell phone, investigators located a series of messages with someone saved under the name, "Cats," which detailed numerous sales by Owens of catalytic converters to an individual later identified as Alexander Kolitsas, the owner and operator of Downpipe Depot & Recycling LLC.

The discovery of the text messages and the identification of Alexander Kolitsas, led to an extensive investigation into the operation of Downpipe Depot & Recycling. Although he had no licenses or permits, Kolitsas advertised Downpipe Depot & Recycling LLC as a secondhand dealer/recycler of scrap metal. In reality, Kolitsas was utilizing the business as a front to purchase stolen catalytic converters from a network of local criminals, his "suppliers," including Theodore Owens, Roberto Alicea, Francisco Ayala, and many others.

Kolitsas met with his suppliers and purchased stolen converters at numerous locations, including his residence at 18 Tyrell Drive in Wolcott, which he often used to meet with customers late at night or early in the morning, or when the supplier told Kolitsas they needed to get rid of the converters quickly.  Kolitsas also utilized the parking lot of Maples Family Restaurant in Middlebury, which is owned by his father, to meet with suppliers during daytime hours because he considered it "safe" and away from the view of law enforcement.

In early 2022, Kolitsas rented a warehouse at 191 Park Avenue in East Hartford.  Kolitsas hired Bryant Bermudez and others to work at this location, purchasing stolen converters for cash, and then sorting the converters for resale and delivery to recycling centers in New York and New Jersey.  Due to the nature of the business, Kolitsas and Bermudez maintained numerous firearms at this location for the purpose of protecting the stolen converters and cash assets from potential robberies, especially during hours when they were meeting with their suppliers.

Starting in January 2022, Kolitsas maintained electronic invoices reflecting the purchase of stolen catalytic converters from his suppliers, including Alicea, Ayala and many others.  In

several of the invoices, Kolitsas permitted his suppliers to use fictitious names or business names in order to create the appearance of proper recordkeeping while obscuring from his records the true source of the stolen converters.

The invoices show that between approximately January 26, 2022 and May 31, 2022, Kolitsas paid approximately $3,345,675 to purchase stolen converters from co-conspirators, including those charged in the Indictment.  Communications obtained from Kolitsas' Facebook account and text messages reveal that prior to keeping invoices, Kolitsas purchased several thousand dollars' worth of stolen catalytic converters from suppliers like Ayala and others.

### B.  Resale of Stolen Converters and Profits

As set forth above, after purchasing the stolen converters for cash, Kolitsas and Bermudez, would transport and sell the stolen converters to Superior Auto and Ace Auto owned by brothers Andrew and Alan Pawelsky in New York, and to DG Auto, in New Jersey. The Pawelskys would pay Kolitsas and Bermudez mostly in cash.  Kolitsas and Bermudez then used the cash to purchase additional converters from their customers in Connecticut. According to bank records and electronic business records obtained during a search of Kolitsas's phone, residence, and warehouse, during the period of the conspiracy, Kolitsas received over $2.3 million in wire payments from DG Auto Parts from the re-sale of catalytic converters, including converters that had been stolen.  In that same time period, Kolitsas received over $1.3 million in wire payments from the Pawelsky brothers, representing only a small fraction of the total payments from the Pawelsky brothers during that time period, which were predominantly in cash.  During an interview with ATF, Andrew Pawelsky estimated that he paid Kolitsas approximately $10 million in cash for catalytic converters, including converters that he could tell had been stolen.

### C.  Cash and other Seizures

During a search of Kolitsas's warehouse at 191 Park Avenue in East Hartford on June 1,

2022, ATF seized (1) one white Ford Transit van that had been observed on previous locations traveling to New York to deliver stolen catalytic converters to Pawelsky, (2) one IWI model Uzi pro pistol and several rounds of assorted ammunition, (3) approximately 19 catalytic converters, and (4) large quantities of cash, including approximately $20,100 seized from a blue bag maintained by Bryant Bermudez at the location, and approximately $8,020 located in a black bag inside the business.

During a search of Kolitsas's residence at 18 Tyrell Drive on June 1, 2022, ATF seized (1) four firearms including an HS Produkt Model Hellcat 9mm handgun, a CZ Scorpion EVO 3-S1 9mm rifle, a Palmetto State Armory rifle and a Mossberg Shockwave 12-gauge shotgun along with several hundred rounds of assorted ammunition, (2) bank security bags, a cash counter, and numerous paper cash bands, and (3) several additional catalytic converters, among other things. On this same date, ATF seized from Kolitsas's person approximately $47,007 in cash proceeds that Kolitsas had with him for the purpose of purchasing additional catalytic converters for the business, and a Glock Model 43X semi-automatic pistol.

### D. Evidence Specific to Roberto Alicea

During the search of Kolitsas's Facebook account, investigators located a series of communications between Kolitsas and Alicea regarding the purchase of catalytic converters. During the conversations, Alicea would tell Kolitsas how many "pieces" he had to sell, at times, anywhere from "15-20," or "30-40," and later estimating that during one trip, he had "20k" worth of converters, and a few days later, "10k more by morning."   Records maintained by Downpipe Depot reflect approximately $540,145.000 in cash payments to Alicea's purported business, LTD Auto, between February and May 2022.

Alicea acquired converters by purchasing directly from "cutters," who are the individuals stealing converters off vehicles in the community. In exchange for this service, which allowed

Kolitsas's business to distance itself from direct association with the thefts, Alicea received a portion of Kolitsas's profits made from those sales. For example, from March through April 2022, Kolitsas purchased stolen catalytic converters directly from co-conspirator Francisco Ayala. After warning Ayala numerous times to not talk about the stolen nature of the converters in text messages, Kolitsas started refusing business directly from Ayala and told Ayala to "hit up bebe."

Finally, even though Alicea was a felon, he and Kolitsas exchanged messages and photos of firearms, including series of messages on March 9, 2022 wherein Kolitsas messaged Alicea a picture of a firearm stating, "just got a sling, lol" to which Alicea responded with a picture of his own firearm, stating "fireeeeee I like that fresh af I got nice ar but in pr chipped shoot fire." ATF investigators understand Alicea to mean that he as an AR-15 style rifle ["ar"] which he keeps in Puerto Rico ["pr"].

## II.       THE GUIDELINES CALCULATION

As to Count One of the Indictment, both the plea agreement and the PSR calculate Alicea's base offense level to be six under U.S.S.G. § 2B1.1(a)(2), with an additional 12 levels added because the loss amount associated with the offense exceeded $250,000 but was less than $550,000 under U.S.S.G. § 2B1.1(b)(1)(F). Both the parties and the PSR also agree that two levels are added under U.S.S.G. § 2B1.1(b)(2)(A)(i) because the offense involved 10 or more victims, two additional levels are added under U.S.S.G. § 2B1.1(b)(4) because the offense involved receiving stolen property and the defendant was a person in the business of receiving and selling stolen property, and two more levels are added under U.S.S.G. § 2B1.1(b)(15) because the offense involved an organized scheme to steal or receive stolen vehicles or vehicle parts. The parties agree and the PSR further agrees that Count One and Count Four are grouped. This results in a total adjusted offense level of 24.

The parties and the PSR further agree that Alicea is a Criminal History Category IV and that the defendant should receive a three-level reduction based on his acceptance of responsibility resulting in a total offense level of 21. The PSR calculates the applicable Guidelines range, therefore, to be 57 to 71 months of imprisonment, followed by supervise release of one to three years.

### III.   THE LAW

After the Supreme Court's holding in *United States v. Booker*, 543 U.S. 220, 243-245 (2005) rendered the Sentencing Guidelines advisory rather than mandatory, a sentencing judge is required to: "(1) calculate[] the relevant Guidelines range, including any applicable departure under the Guidelines system; (2) consider[] the Guidelines range, along with the other § 3553(a) factors; and (3) impose[] a reasonable sentence." *See United States v. Fernandez*, 443 F.3d 19, 26 (2d Cir.), cert. denied, 127 S. Ct. 192 (2006); *United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005). The § 3553(a) factors include: (1) "the nature and circumstances of the offense and history and characteristics of the defendant"; (2) the need for the sentence to serve various goals of the criminal justice system, including (a) "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment," (b) to accomplish specific and general deterrence, (c) to protect the public from the defendant, and (d) "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"; (3) the kinds of sentences available; (4) the sentencing range set forth in the guidelines; (5) policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to victims. *See* 18 U.S.C. § 3553(a).

## IV.     DISCUSSION

### A.  Nature and Circumstances of the Offense and Seriousness of the Offense

The catalytic converter scheme that was being operated by Alexander Kolitsas was a substantial operation that generated millions of dollars in sales.  Because the recyclers in New York and New Jersey often paid Kolitsas in cash, investigators were not able to determine a precise accounting of just how much he was paid, but it was certainly in the millions.  As indicated above, Andrew Pawlesky estimated that he had paid Kolitsas over $10 million dollars in cash and that does not include the hundreds of thousands of dollars in wire transfers that have been discovered. This money was "earned" at the expense of individual vehicle owners all over the state of Connecticut who had their vehicles damaged.  Kolitsas' entire operation was only possible because he had a steady flow of catalytic converters to sell.

As one of Kolitsas's largest suppliers of stolen converters, Alicea enabled the business to operate and generate significant profits for both of them. Alicea's role was unlike either Theodore Owen's or Francisco Ayala's roles in the conspiracy, both of whom have been sentenced in this case.  Owen and Ayala were street cutters who sold to Kolitsas whatever they could acquire unlawfully on the street.  Alicea, in contrast, operated much more like Kolitsas himself—a middle-man, moving stolen converters from the street to larger recycling shops paying top dollar for the converters' precious medals.  For that reason, his level of culpability is greater than Owen and Ayala.

However, Alicea contends that he was less culpable than Bermudez.  *See* Def.'s Mem. at 8 n.12.  Bermudez was Kolitsas's employee who assisted Kolitsas in the purchase of stolen catalytic converters at Downpipe Depot's East Hartford location, and Bermudez also helped Kolitsas transport the purchased converters to recycling centers in New York and New Jersey.  In terms of attributable loss amount as a proxy for culpability, Bermudez, comes out above.  But in terms of

7

ensuring the scheme functioned, Bermudez may have made Kolitsas's business run more efficiently, but Alicea (along with Kolitsas's other top suppliers) was the necessary conduit through which stolen converters were acquired. Without that supply, Kolitsas's scheme would not have been as profitable. And, as set forth above, both Kolitsas's and Alicea's businesses were immensely profitable. For these reasons, the sentence imposed must be significant.

## B. History and Characteristics of the Defendant

The mitigating aspects of Alicea's background are worthy of consideration. Alicea faced many challenges as a child, from watching the physical abuse of his mother and struggling with substance abuse and addiction, to being exposed to organized gang activity, not just in his community but by his father within his own home. *See* PSR ¶¶ 68-74; Def.'s Mem. [ECF No. 174] at 2-5. As a result of those experiences, Alicea undoubtedly believed that he had no choice but to turn to crime. At 18 years old, Alicea was convicted for third-degree larceny. At 20 years old, he was convicted of first-degree criminal trespass and property damage when Alicea's dirt bike struck and injured a pedestrian and his dog. At 24 years old, Alicea's conduct escalated to being involved in a shooting during a car racing event in New Britain. He was ultimately convicted of second-degree assault with a firearm and carrying a dangerous weapon. He also has a conviction for engaging in a police pursuit in 2019. In consideration for Alicea's struggles as a youth, and the way in which they may have contributed to his decision-making leading up to the offense conduct, the Government acknowledges that a sentence at the bottom of the Guidelines range would be appropriate.

But at the same time, this offense is not like his others. While property crimes and criminal possession of a firearm might have reasonably flowed from the trauma he experienced as a child, this was a crime of driven by greed and excess, in order to fuel a life of partying and gambling. During the offense conduct, Alicea owned his own body shop, Meriden Auto Body, and claims

that he had two employees and made about $28,000 per month in personal income from that business. *See* PSR ¶ 87. But instead of settling for that honest living, he focused on supplementing that income with money from Kolitsas—over a half million dollars' worth of income—which he undoubtedly used to further his partying and gambling lifestyle. These are aggravating factors that the Court should consider when determining the appropriate sentence in this case.

In addition, Alicea's requests for downward departures or variances are not supported by the record. First, Alicea seeks a downward departure for being "truly repentant" and exhibiting a "higher degree of contrition" than other defendants who receive a two-level reduction for acceptance of responsibility, but he provides no specific evidence in support of that claim. While the defendant has participated in educational programming at Wyatt, these programs are available to and utilized by many defendants in anticipation of sentencing. They do not suggest, at this point, that he deserves additional consideration from the Court in the form of a downward departure. Moreover, he's received four disciplinary infractions since being detained at Wyatt, including one for possessing an unauthorized tattoo gun, using another detainee's tablet, and engaging in two unauthorized video visits. *See* PSR ¶ 5. And beyond entering a guilty plea, he has not proffered or provided any information to law enforcement that would assist with either locating victims of his crimes or seeking to make them whole. In short, nothing in the record suggests that the defendant should be afforded some reduction beyond the two levels already contemplated by the Guidelines range, at least not for exhibiting a higher degree of contrition and repentance than other offenders coming before the Court.

Similarly, the defendant argues that he should be afforded a downward departure in order to reduce the "destructive effects" that a term of imprisonment would have by removing him from his family. *See* Def. Mem. at 8. While this is certainly an important factor to consider for any parent being removed from his or her family for an extended period of time, the Court should also

consider that despite having five children all under the age of 11, until now, Alicea has made very little effort to spend any meaningful time with any of them, by his own admission, consistently choosing instead to party in Puerto Rico and engage in street racing. *See* PSR ¶ 129. The defendant should receive little consideration on this request for a downward departure as well.

Finally, Alicea argues that his criminal history overstates the seriousness of his criminal conduct because it subjects him to a higher Guidelines range despite not serving a significant term of imprisonment on any prior offense. As the defendant quotes in his own sentencing memorandum:

> [A] major reason for imposing an especially long sentence upon those who have committed prior offense is to achieve a deterrent effect that the prior punishments failed to achieve. That reason requires an appropriate relationship between the sentence for the current offense and the sentences ,particularly the time served, for the prior offenses . . . **[I]f a defendant served no time or only a few months for the prior offenses, a sentence of even three or five years for the current offense might be expected to have the requisite deterrent effect**.

Def's Mem. at 8 (quoting *United States v. Mishoe*, 241 F.3d 214, 220 (2d Cir. 2001)) (emphasis added).

Here, a sentence at the bottom of the Guidelines range, approximately five years, fits squarely within the Second Circuit's analysis. Despite having served no significant prior term of imprisonment, Alicea has accumulated a criminal history that includes larceny, criminal trespass, property damage, assault with a firearm, carrying a dangerous weapon, and engaging in a police pursuit. Despite these convictions, the corresponding sentences of no more than a few months at a time, have had no deterrent effect whatsoever. As a result, the sentence imposed here must be meaningfully longer than any prior term of imprisonment.

Moreover, Alicea's criminal history is likely underrepresented by the calculation contained in the PSR because it fails to consider the criminal charges that have not yet been resolved. First, Alicea was arrested for a series of catalytic converter thefts from three separate business in

Farmington between February and March 2021. *See* PSR ¶ 59.  During the investigation of those thefts, Farmington Police Department learned that the same suspects were wanted for approximately 35 catalytic converter thefts in Nassau County, New York.  The suspect vehicle in those thefts was located and found to contain tools such as saw blades, work gloves, and a ski mask that returned a DNA match to Alicea.  *See id.* Second, in November 2021, the Hartford Police Department located a 2020 Honda Accord that had been reported stolen, followed the stolen vehicle to a Citgo gas station and observed the driver, Alicea, get out and enter the convenience store.  *See* PSR ¶ 63. As officers approached the vehicle, a passenger jumped into the driver's seat, put the vehicle in reverse, and struck a police vehicle while attempting to escape. *Id.* These arrests show how Alicea continued to engage in serious criminal conduct, even after his last term of imprisonment, even though those police encounters are not reflected in his criminal history computation. For these reasons, the defendant's request for a downward departure or variance on the basis of an overrepresented criminal history should be denied.

### C. Promoting Respect for the Law, Protection of the Public, and Deterrence

The sentence imposed should also provide adequate deterrence, protection for the public, and it must promote respect for the law.

As set forth above, none of Alicea's prior arrests, convictions, or terms of imprisonment, have deterred his criminal conduct.  In fact, even after being arrested for a series of catalytic converter thefts between February and March 2021, he did not stop the conduct.  Instead, he operated smarter and set up a business to purchase stolen catalytic converters from others to shield himself from the risk of being caught engaged in the actual thefts, while continuing to rake in the profits. The sentence imposed by this Court needs to be significant enough to stop his criminal activity, where all prior terms of imprisonment have failed.

Similarly, the sentence imposed must promote respect for the law, as Alicea has repeatedly demonstrated in his prior criminal cases that he has little regard for the orders of the state court (as evidenced by the numerous failures to appear), the order or direction of law enforcement (as evidenced by his conviction for engaging in police pursuit and arrest for evading police detention), and the orders of his state probation officers (as evidenced by Alicea cutting off his location monitoring bracelet so that he could abscond to Las Vegas without permission to get married).  If Alicea is going to be successful on supervised release following any term of imprisonment, the sentence imposed must convey in the clearest of terms, that Alicea must respect the orders of the court, the probation office, and simply follow the law.

Finally, the Court should also consider general deterrence. This is particularly relevant as to the catalytic converter theft scheme. Not only does this crime continue to run rampant in our community, but it is a unique type of crime that involves both violence and pecuniary gain that has been afforded a significant amount of coverage by the media and news outlets.  In reality, very few people have been held accountable at this level for this type of offense, due to the difficulty with connecting the stolen property to victims of the thefts, and as a result, the sentence imposed by this Court will act as a very clear signal to the community as to whether this conduct will be tolerated.

## V.    CONCLUSION

For the reasons stated herein and on the full record of this case and an assessment of the factors outlined in 18 U.S.C. § 3553(a), the Government respectfully submits that in light of the seriousness of the offense, the defendant's history and characteristics, and the need of the sentence to provide just punishment, respect for the law and to deter the defendant and others from engaging in criminal activity, the sentence which is sufficient by not greater than necessary to accomplish

those various sentencing goals is a term of imprisonment at the bottom of the Guidelines range,

approximately 60 months of imprisonment.

Respectfully submitted,

VANESSA ROBERTS AVERY
UNITED STATES ATTORNEY

*/s/ Lauren C. Clark*
LAUREN C. CLARK
Federal Bar No. phv09365

REED DURHAM
ASSISTANT U.S. ATTORNEYS
1000 Lafayette Boulevard, 10th Floor
Bridgeport, CT 06604
Tel: (203) 696-3000

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 29, 2023, a copy of the foregoing was filed electronically with the court and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent to all parties by operation of the court's electronic filing system.  Parties may access this filing through the court's system.

<i>/s/Lauren C. Clark</i>

LAUREN C. CLARK
ASSISTANT UNITED STATES ATTORNEY